THE HONORABLE DAVID G. ESTUDILLO

**UNITED STATES DISTRICT COURT**
**IN AND FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| GERARDO BAEZ GARCIA, LUKE LOPEZ, and ROWDY PAYNE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CALIBER CONCRETE CONSTRUCTION, INC., a Washington Corporation in the State of Washington, and DOES 1 through 100, inclusive,<br><br>Defendants. | No. 3:26-cv-06146-DGE<br><br>**DECLARATION OF ROWDY PAYNE IN SUPPORT OF OPPOSITION TO MOTION TO DISMMISS** |

1. I am a resident of Washington State, over the age of eighteen, and competent to testify to the matters set forth herein.

2. I am a Plaintiff in this matter, have personal knowledge of the facts described below, and make this declaration based upon my personal knowledge.

3. At all relevant times herein, I was a member of the Local 528 Cement Masons & Plasterers Union.

4. I began working for Caliber Concrete Construction, Inc. ("Caliber") on or around March 12, 2018, as an hourly-paid concrete finisher. I was promoted to "lead finisher" in 2020.

/ /



**BIBIYAN LAW GROUP, P.C.**
COLUMBIA CENTER
701 5th Ave., 42nd Floor
Seattle, WA 98104
Telephone: (206) 225-2043

5. I worked an average of five (5) days per week during the off-season and winter months. During the peak construction season and summer months, I routinely worked six (6) days per week.

**A. I Was Not Compensated For Pre-Shift and Post-Shift Off-the-Clock Work.**

6. Throughout my tenure at Caliber, my daily scheduled shift was recorded by Caliber's foreman as starting at 7:00 a.m. and concluding at 3:00 p.m.

7. However, from my first day of employment, Caliber Operational Manager Rob Reeves ("Mr. Reeves") and site foremen instructed me and other crew members to arrive at Caliber's central shop well before our scheduled start time—typically between 4:30 a.m. and 5:30 a.m. every morning.

8. During this mandatory pre-shift period (often lasting 1.5 to 2 hours), Mr. Reeves and the foremen directed me to perform manual labor, including cleaning out company trucks, loading heavy lumber, organizing and loading steel concrete forms, inspecting tools, and preparing materials for the day's pour. I was never compensated for this time.

9. Similarly, although the foreman recorded my shift as ending at 3:00 p.m., I was still required to drive the company truck back to Caliber's main shop after finishing at my assigned job site.

10. Once back at the main shop, I had to unload equipment, return company keys, and sign out for the day.

11. This post-shift work regularly added at least one additional hour to my workdays.

12. Accounting for the total hours of pre-shift and post-shift work I completed each day, I estimate that I performed between seven (7) to ten (10) hours of uncompensated, off-the-clock work each week.



BIBIYAN LAW GROUP, P.C.
COLUMBIA CENTER
701 5th Ave., 42nd Floor
Seattle, WA 98104
Telephone: (206) 225-2043

**B. I Rarely Received Overtime.**

13. Despite working between forty five (45) and forty eight (48) hours each week, I was rarely paid overtime.

14. On the rare occasion that I was paid overtime, Caliber only did so for those hours in which I worked past 3 p.m.

15. When recorded, these hours did not appear accurate and instead reflected between thirty (30) minutes to an hour of overtime being manually deducted from my pay each week.

**C. I Was Not Provided Rest Periods.**

16. Caliber routinely forced me and other crew members to work shifts of four, six, or eight or more consecutive hours without receiving a single uninterrupted ten-minute rest break.

17. Foremen repeatedly told me and other crew members that rest breaks were not permitted because concrete was perishable and "would harden and ruin the pour" if left unattended.

18. During the summer months, we regularly poured and finished concrete in direct sun and temperatures exceeding 90 to 100 degrees Fahrenheit.

19. Caliber did not provide cool-down rest periods or shade, ordering us to continue attending to the concrete without interruption even when crew members showed visible signs of heat exhaustion and distress.

20. Caliber did not provide rest areas, shade structures, or seating at job sites.

21. I was never paid for the rest periods Caliber denied me.

**D. I Was Not Provided Meal Periods.**

22. Just as with rest breaks, Caliber foremen repeatedly emphasized that me and crew members were not permitted to take lunches while concrete was curing.



**BIBIYAN LAW GROUP, P.C.**
COLUMBIA CENTER
701 5th Ave., 42nd Floor
Seattle, WA 98104
Telephone: (206) 225-2043

23. As a result, I was forced to either skip lunch entirely or attempt to take quick bites of food while actively operating trowels, screeds, and finishing equipment.

24. I was never compensated for the meal breaks Caliber denied me.

**E. Caliber's Retaliatory Conduct Forced Me To Resign.**

25. In or around the early Fall of 2024, I confronted Operational Manager Rob Reeves regarding Caliber's payment practices.

26. During this conversation, I expressed concern regarding our mandatory, unpaid off-the-clock pre-shift loading and post-shift travel, as well as Caliber's failure to pay us overtime wages.

27. In response to my wage inquiry, Mr. Reeves became visibly enraged. He yelled at me and stated that, effective immediately, I would "no longer be permitted to use Caliber Concrete trucks" to transport tools or drive to and from jobsites.

28. The very next morning when I reported to work, Caliber Concrete Superintendent Rick Dolan ("Mr. Dolan") reiterated Mr. Reeves' directive. Mr. Dolan told me that I was strictly barred from using company trucks and had to use my personal vehicle to drive to and from jobsites.

29. Mr. Dolan explicitly informed me that if I failed or refused to drive my personal vehicle, I would be fired on the spot.

30. That same day, Caliber directed me to drive my personal vehicle 40 miles each way between Caliber's shop in Pacific, Washington, all the way in Sammamish, Washington.

31. Caliber provided no reimbursement for the nearly 400 miles of fuel and vehicle wear-and-tear I incurred during this period, which lasted nearly a week.

/ /



**BIBIYAN LAW GROUP, P.C.**
COLUMBIA CENTER
701 5th Ave., 42nd Floor
Seattle, WA 98104
Telephone: (206) 225-2043

32. Shortly thereafter, Caliber began drastically cutting my scheduled hours. Throughout 2024, I had consistently worked 40 or more hours per week. However, beginning on or around October 24, 2024, Caliber slashed my schedule to an average of merely 23 hours per week.

33. Despite my requests for work, Caliber continued to suppress my hours. This retaliatory reduction left me with no alternative but to resign from my position.

34. My final week of work at Caliber occurred on or around December 26, 2024.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Signed this 13th day of November, 2026, at Federal way, Washington.

Rowdy L Payne

Rowdy Payne



**BIBIYAN LAW GROUP, P.C.**
COLUMBIA CENTER
701 5th Ave., 42nd Floor
Seattle, WA 98104
Telephone: (206) 225-2043